

# EXHIBIT A

# STOCK PURCHASE AGREEMENT
## Among

## SPENTA ENTERPRISES LTD.
### as Purchaser

## HOSHANG R. KARANI
### as Guarantor

## CHIZUCO COLEMAN
### as Seller

### and

## COLEMAN FIRE PROOF DOOR CO.

### September 27, 2006



**EXHIBIT**

_A_

TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Rules of Construction | 1 |
| ARTICLE II | PURCHASE AND SALE OF SHARES | 5 |
| 2.1 | Purchase and Sale of the Shares | 6 |
| 2.2 | Consideration | 6 |
| 2.3 | Closing | 6 |
| ARTICLE III | REPRESENTATIONS AND WARRANTIES OF SELLER | 8 |
| 3.1 | Title to Shares | 8 |
| 3.2 | Capitalization | 8 |
| 3.3 | Organization and Qualification | 8 |
| 3.4 | Authority | 9 |
| 3.5 | No Conflict | 9 |
| 3.6 | Required Filings and Consents | 9 |
| 3.7 | Financial Statements | 10 |
| 3.8 | Absence of Undisclosed Liabilities | 10 |
| 3.9 | Absence of Certain Changes or Events | 10 |
| 3.10 | Real Property | 10 |
| 3.11 | Intellectual Property | 12 |
| 3.12 | Contracts | 13 |
| 3.13 | Permits | 13 |
| 3.14 | Compliance with Laws | 15 |
| 3.15 | Litigation | 15 |
| 3.16 | Employment Matters | 15 |
| 3.17 | Employee Benefits | 16 |
| 3.18 | No Finder | 16 |
| 3.19 | Taxes and Tax Returns | 18 |
| 3.20 | Customers and Suppliers | 18 |
| 3.21 | Subsidiaries | 18 |
| 3.22 | Insurance | 19 |
| 3.23 | Title to and Sufficiency of Assets | 19 |
| 3.24 | Tangible Assets | 19 |
| 3.25 | Accounts Receivable | 19 |
| 3.26 | Inventory | 19 |
| 3.27 | Bank Accounts | 20 |
| 3.28 | Computer System | 20 |
| 3.29 | Environmental | 20 |
| 3.30 | Prior Prospective Purchasers | 20 |
| 3.31 | Certain Payments | 22 |
| 3.32 | Accuracy of Statements | 22 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 22 |
| 4.1 | Organization and Qualification | 22 |

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 4.2 | Authority Relative to this Agreement | 23 |
| 4.3 | No Conflict | 23 |
| 4.4 | Required Filings and Consents | 23 |
| 4.5 | No Finder | 23 |
| 4.6 | No Litigation | 23 |
| **ARTICLE V** | **ADDITIONAL COVENANTS** | 24 |
| 5.1 | Consents, Filings and Authorizations; Efforts to Consummate | 24 |
| 5.2 | Public Announcements | 24 |
| 5.3 | Restrictive Conenants | 24 |
| 5.4 | Expenses | 24 |
| 5.5 | Section 338 Election | 24 |
| 5.6 | Excluded Liabilities | 24 |
| 5.7 | Seller's Post Closing Assistance | 25 |
| 5.8 | Prorations, Prepaid Expenses, Refunds and Rebates | 25 |
| 5.9 | Lease and Option Regarding Leased Real Property | 25 |
| 5.10 | Supply Bonds | 26 |
| **ARTICLE VI** | **CONDITIONS TO CLOSING** | 26 |
| 6.1 | Conditions to the Obligations of Seller and Purchaser | 26 |
| 6.2 | Conditions to Obligation of Seller | 26 |
| 6.3 | Conditions to Obligation of Purchaser | 26 |
| 6.4 | Non Competitive Agreements | 27 |
| 6.5 | Financing | 29 |
| 6.6 | Key Employees | 29 |
| 6.7 | Termination of Tax Year | 29 |
| **ARTICLE VII** | **POST-CLOSING COVENANTS** | 29 |
| 7.1 | Tax Covenants | 29 |
| 7.2 | Records; Retention | 30 |
| **ARTICLE VIII** | **SURVIVAL; INDEMNIFICATION** | 31 |
| 8.1 | Expiration of Representations and Warranties | 31 |
| 8.2 | Indemnification by Seller | 31 |
| 8.3 | Indemnification by Purchaser | 31 |
| 8.4 | Notice of Claims | 31 |
| 8.5 | Opportunity to Defend Third Party Claims | 31 |
| 8.6 | Effect of Insurance and Other Sources of Reimbursement | 32 |
| 8.7 | Payment of Losses; Basket; Cap | 32 |
| 8.8 | Off Set | 33 |
| **ARTICLE IX** | **GENERAL** | 33 |
| 9.1 | Notices | 33 |
| 9.2 | Severability | 33 |
| 9.3 | Assignment; Binding Effect | 34 |
| 9.4 | Exhibits and Schedules | 34 |
| 9.5 | Governing Law; Submission to Jurisdiction | 34 |
| 9.6 | Waiver of Jury Trial | 35 |

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| 9.7 | Interpretation | 35 |
| 9.8 | Counterparts | 35 |
| 9.9 | Entire Agreement | 35 |
| 9.10 | Waivers and Amendments | 35 |
| 9.11 | No Third Party Beneficiaries | 35 |
| 9.12 | Further Assurances | 36 |
| | | 36 |

## EXHIBITS

| | |
|---|---|
| Exhibit 2.2 | Note |
| Exhibit 2.2A | Guaranty |
| Exhibit 2.2B | Security Agreement |
| Exhibit 5.3 | Form of Restrictive Covenant Agreement |
| Exhibit 5.5 | Allocation of Purchase Price |
| Exhibit 5.9 | Real Estate Lease and Option |

## SCHEDULES

| | |
|---|---|
| Schedule A | Excluded Assets |
| Schedule 3.6 | Required Filing and Consents |
| Schedule 3.7 | Financial Statements |
| Schedule 3.8 | Undisclosed Liabilities |
| Schedule 3.9 | Absence of Certain Changes |
| Schedule 3.10(a) | Leases - Real Property |
| Schedule 3.10(b) | Leases - Exceptions |
| Schedule 3.11 | Intellectual Property |
| Schedule 3.12(a) | Material Contracts |
| Schedule 3.12(b) | Material Contracts - Exceptions |
| Schedule 3.13 | Permits |
| Schedule 3.15 | Litigation |
| Schedule 3.16 | Employment Matters |
| Schedule 3.17 | Employee Benefit Plans |
| Schedule 3.19 | Taxes and Tax Returns |
| Schedule 3.20 | Customers and Suppliers |
| Schedule 3.22 | Insurance Policies |
| Schedule 3.23 | Title and Assets |
| Schedule 3.24 | Tangible Assets - Liens |
| Schedule 3.25 | Accounts Receivable |
| Schedule 3.26 | Inventory |
| Schedule 3.27 | Bank Accounts |
| Schedule 3.28 | Computer System |
| Schedule 3.29(a) | Real Property Owned or Leased |
| Schedule 3.29(b) | Environmental Concerns |

# TABLE OF CONTENTS

Schedule 3.29(d)    Hazardous Substances
Schedule 3.29(e)    Storage Tanks
Schedule 3.29(f)    Hazardous Substances– Use, Generation, Transportation, Storage, Treatment and Disposal
Schedule 3.30       Prior Prospective Purchasers
Schedule 5.8        Prorations, Prepaid Expenses, Refunds and Rebates

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (the "Agreement") is made as of _____, 2006, by and among SPENTA ENTERPRISES LTD., an Illinois corporation ("Purchaser"), HOSHANG R. KARANI, an individual and resident of the State of Illinois ("Guarantor") CHIZUCO COLEMAN, an individual and resident of the State of Illinois ("Seller"), and COLEMAN FIRE PROOF DOOR CO., an Illinois corporation (the "Company"), with regards to the stock of the Company.

## RECITALS

A.     The Company is engaged in the business of assembling and distributing doors and door systems (the "Business").

B.     Seller is the holder of all of the issued and outstanding shares of stock in the Company (the "Shares").

C.     Subject to the terms and conditions set forth herein, Seller desires to sell, transfer, assign and deliver to Purchaser, and Purchaser desires to purchase and acquire from Seller, all of Seller's right, title and interest in and to the Shares (the "Acquisition").

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     Definitions.   As used herein, the following terms shall have the following meanings:

"Accounts Receivable" means all accounts receivable, trade receivables, notes receivable and other receivables which are payable for goods sold or services provided by the Company.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Benefit Plan" means any employee benefit plan, program, policy, contract (whether or not written) or arrangement, including any pension or retirement plan, deferred compensation plan, vacation pay plan, stock option plan, bonus plan, change in control agreement or plan, stock purchase plan, hospitalization, disability or other insurance plan, or severance, retention or termination pay plan or policy, maintained, sponsored, or contributed to by the Company with respect to which the Company has any liability whether contingent or otherwise.

"Business Day" means any day other than a Saturday, Sunday or a day on which banks in Chicago, Illinois are authorized or obligated by applicable law to close.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Intellectual Property" means all of the Intellectual Property used in the conduct of the Business.

"Computer System" means, collectively, all computer hardware and software and related materials used by the Company.

"Contract" means any contract, lease, binding commitment, sales order, purchase order, agreement, indenture, mortgage, note, bond, warrant, instrument or license, whether written or oral.

"Environmental Law" shall mean any federal, state and local statutes, regulations, ordinances and rules, the effective date of which shall be prior to the Closing Date, relating to (i) the emission, discharge, release or threatened release of a Hazardous Substance into the air, surface water, groundwater or land; (ii) the manufacturing, processing, use, generation, treatment, storage, disposal, transportation, handling, removal, remediation or investigation of a Hazardous Substance; or (iii) the protection of human health, safety or the indoor or outdoor environment, including without limitation, the Clean Air Act, the Federal Water Pollution Control Act, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Occupational Safety and Health Act, all amendments thereto, all regulations promulgated thereunder and any similar or related state or local statutes, ordinances and regulations.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means with respect to any Person, any corporation, trade or business which, together with such Person, is a member of a controlled group of corporations or a group of trades or business under common control or is otherwise treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"Excluded Assets" means those assets of the Company listed on Schedule A attached hereto and hereby made a part hereof.

"Financial Statements" means, collectively, (a) the Year 2005, Year 2004 and Year 2003 Statements, and (b) the Interim Statements.

"GAAP" means generally accepted accounting principles as set forth from time to time in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, applied on a consistent basis.

"Governmental Authority" means the government of the United States, any state or political subdivision thereof, or any entity, body or authority exercising executive, legislative,

judicial, regulatory, administrative or other governmental functions or any court, department, commission, board, agency or instrumentality of any of the foregoing.

"Hazardous Substance" means any solid, liquid or gaseous substance, chemical, compound, product, byproduct, waste or material that is or becomes regulated, defined or designated by any applicable federal, state or local governmental authority or by any Environmental Law as hazardous, extremely hazardous, imminently hazardous, dangerous or toxic, or as a pollutant or contaminant, and shall include, without limitation, hazardous substances defined by the federal Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. §9601 et seq.), asbestos, polychlorinated biphenyls, petroleum and petroleum products and byproducts.

"Intellectual Property" means all United States and foreign patents (including continuations, continuations-in-part, reissues and re-examinations thereof) and patent applications; registered and unregistered trade names, trademarks, service names and service marks (and applications for registration of the same) and all goodwill associated therewith; copyrights and copyright registrations (and applications for the same); trade secrets, computer data (including formulations and analyses), computer software (in source code and object code form) and all related programming, user and systems documentation; inventions, processes and designs (whether or not patentable or reduced to practice); know-how and formulae; and all other similar intangible assets, properties and rights throughout the world.

"Interim Statement" means an unaudited, interim financial statement of the Company prepared on a monthly basis relating to the period after December 31, 2005 and prior to the Closing, consisting of a balance sheet as of the end of the applicable calendar month and an income statement for such month.

"Inventory" means all supplies, materials and other inventories.

"IRS" means the United States Internal Revenue Service.

"Lien" means any mortgage, lien, pledge, charge, equitable interest, right-of-way, easement, encroachment, security interest, preemptive right, right of first refusal or similar restriction or right, option, judgment, title defect or encumbrance of any kind.

"Line of Credit Payoff" shall mean the amount required to be paid by the Company, inlcuding but not limited to fees, expesnes, principal and interest and any other amounts due or to become due to such lender(s) as of the Closing Date to any lender having loaned money to the Company and the agreement of such lender to release any and secuity interests on the assets of the Company upon receipt of such Payoff.

"Losses" means losses, claims, damages of every type, nature or description, fines, penalties, Taxes arising from the receipt of any indemnification payments pursuant to Article VIII hereof, costs and expenses, including court costs account fees and costs, proof of claim expenses, expert witness fees and costs, remediation costs and reasonable fees and disbursements of counsel.

"Material Adverse Effect" means any change or effect that, individually or taken together with all other such changes or effects that have occurred prior to the date of determination of the Material Adverse Effect, is materially adverse to the Business, assets, financial condition or results of operations of the Company considered as a whole.

"Material Contracts" means the Contracts required to be listed on Schedule 3.12(a).

"Party" means Seller or Purchaser, as the context requires, and the term "Parties" means, collectively, Seller and Purchaser.

"Permit" means any permit, license, approval, franchise, certificate, consent or other authorization of any Governmental Authority.

"Permitted Lien" means:   (a) any Lien imposed by law for Taxes, assessments or governmental charges that are not yet delinquent and remain payable without penalty or that are being contested in good faith by appropriate proceedings; (b) any carrier's, warehousemen's, mechanic's, materialmen's, repairmen's or other like Lien imposed by law, arising in the ordinary course of business and securing obligations that are not yet due and payable or are being contested in good faith by appropriate proceedings; (c) any pledge or deposit made in the ordinary course of business in compliance with workers' compensation, unemployment insurance or other social security laws or other statutory obligations of Seller or the Company; (d) any Lien created by Purchaser; and (e) any cash deposit or right of set-off to secure the performance of bids, tenders, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds, government contracts and other obligations of a like nature, in each case imposed in the ordinary course of business.

"Person" means an individual, corporation, partnership, limited partnership, limited liability company, limited liability partnership, syndicate, person (including a "person" as defined in Section 13(d)(3) of the Securities Exchange Act of 1934), trust, association, entity or government or political subdivision, agency or instrumentality of a government.

"Pre-Closing Tax Period" shall mean (a) any Tax period ending on or before 12:01 a.m. on the Closing Date and (b) in the case of any Tax period which includes, but does not end on, the Closing Date, the portion of such period ending on or before 12:01 a.m. on the Closing Date.

"Representative" means, with respect to either Party, any of such Party's directors, officers, managers, employees, attorneys, accountants, brokers, finders, investment bankers or other agents.

"Tax Return" means any return, report, statement, form or other documentation (including any additional or supporting material and any amendments or supplements) filed or maintained, or required to be filed or maintained, with respect to or in connection with the calculation, determination, assessment or collection of any Taxes.

"Tax Statute of Limitations" means the expiration of the applicable statute of limitations with respect to Taxes.

"Tax Warranties" means the representations and warranties in Section 3.19.

646533-4

4

"Taxes" means: (a) any and all taxes, fees, levies, duties, tariffs, imposts and other charges of any kind, imposed by any Governmental Authority, including: (i) taxes or other charges on, measured by, or with respect to income, franchise, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation or net worth; (ii) taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value-added or gains taxes; (iii) license, registration and documentation fees; and (iv) customs duties, tariffs and similar charges; and (b) any and all interest, penalties, additions to tax and additional amounts imposed in connection with or with respect to any amounts described in (a).

"Title and Authorization Warranties" means the warranties set forth in Sections 3.1, 3.4, 3.23 and 4.2.

"Transaction Documents" means, collectively, this Agreement, and each of the other agreements and instruments to be executed and delivered by any of the Parties in connection with the consummation of the Acquisition.

"Year 2005 Statements" means the balance sheet, cash flow statement and income statement of the Company for the 12-month period ended December 31, 2005, each of which has been compiled by Ravencroft Ltd., certified public accountants.

"Year 2004 Statements" means the balance sheet, cash flow statement and income statement of the Company for the 12-month period ended December 31, 2004, each of which has been compiled by Ravencroft Ltd., certified public accountants.

"Year 2003 Statements" means the balance sheet, cash flow statement and income statement of the Company for the 12-month period ended December 31, 2003, each of which has been compiled by Ravencroft Ltd., certified public accountants.

1.2    Rules of Construction.  The definitions in Section 1.1 and elsewhere in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "but not limited to." All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. All Exhibits and Schedules attached to this Agreement shall be deemed incorporated herein by reference as if fully set forth herein. Words such as "herein," "hereof," "hereto," "hereby" and "hereunder" refer to this Agreement and to the Schedules and Exhibits, taken as a whole. Except as otherwise expressly provided herein: (a) any reference in this Agreement to any agreement shall mean such agreement as amended, restated, supplemented or otherwise modified from time to time; and (b) any reference in this Agreement to any law shall include corresponding provisions of any successor law and any regulations and rules promulgated pursuant to such law or such successor law. Neither the captions to Sections or subdivisions thereof nor the Table of Contents shall be deemed to be a part of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF THE SHARES

2.1    Purchase and Sale of the Shares.    Subject to the terms and conditions of this Agreement and in reliance upon the representations, warranties, covenants and agreements of the Parties contained herein, at the Closing Seller shall sell, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Seller, all of the Shares, free and clear of all Liens.

2.2    Consideration.

(a)    Purchase Price.    Subject to the Adjustment Amount, if any, pursuant to Section 5(d), the aggregate purchase price (the "Purchase Price") for the Assets shall be Three Million Dollars ($3,000,000), plus the amount of any Prorations (as defined in Section 5.8) to be paid in accordance therewith.    To the extent the Purchase Price is payable on the Closing Date, such Purchase Price shall be payable as follows:

(i)    the amount of Two Million Two Hundred Thousand dollars ($2,200,000), shall be paid to Seller by wire transfer to an account specified by Seller; provided however that to the extent of the Line of Credit Payoff, such Amount shall be wired directly to the lender(s) named in the Payoff and the amount of the wire transfer to the Seller shall be reduced by the Line of Credit Payoff; and

(ii)    the sum of Eight Hundred Thousand dollars ($800,000), in the form of a Promissory Note in the form attached hereto as Exhibit 2.2 (the "Note"). The Note shall be guaranteed by Guarantor subject to the Guaranty substantially in the form set forth on Exhibit 2.2A attached hereto and hereby made a part hereof (the "Guaranty") and further secured by a security interest in the assets of the Company, which security interest shall at all times be subordinate to the security interests of Purchaser's lenders and shall be in the form attached hereto as Exhibit 2.2B.

(b)    Closing Date Balance Sheet.    Within thirty (30) days after the Closing Date, the Seller shall cause to be prepared a balance sheet of the Company as of the Closing Date (the "Closing Date Balance Sheet"), which shall be prepared in accordance with GAAP and shall include all payables and accruals and other amounts that would be included in a GAAP statement. The Closing Date Balance Sheet shall be compiled by Ravencroft, Ltd. ("Seller's Accountants") at Seller's expense.  Seller shall cause Seller's Accountants to make available to Purchaser and Purchaser's representatives the work papers of Seller's Accountants used in connection with the preparation of the Closing Date Balance Sheet, and shall permit Purchaser and Purchaser's representatives to observe the taking of the related physical inventory.

(c)    Disputes Regarding Closing Date Balance Sheet.    Disputes with respect to the Closing Date Balance Sheet shall be dealt with as follows:

(i)     Purchaser shall have fifteen (15) days after receipt of the Closing Date Balance Sheet from Seller (the "Dispute Period") to dispute any of the elements of or amounts reflected on the Closing Date Balance Sheet (a "Dispute").  If Purchaser does not give written notice of a Dispute within the Dispute Period to Seller (a "Dispute Notice"), the Closing Date Balance Sheet shall be deemed to have been accepted and agreed to by Purchaser in the form in which it was delivered by Seller, and shall be final and binding upon the parties hereto.  If Purchaser has a Dispute, Purchaser shall give Seller a Dispute Notice within the Dispute Period, setting forth in reasonable detail the elements and amounts with which Purchaser disagrees.  Within thirty (30) days after delivery of such Dispute Notice, the parties hereto shall in good faith attempt to resolve such Dispute and agree in writing upon the final content of the Closing Balance Sheet.

(ii)     If Purchaser and Seller are unable to resolve any Dispute within the thirty (30) day period after Seller's receipt of a Dispute Notice, a certified public accounting firm mutually acceptable to Purchaser and Seller (the "Arbitrating Accountant") shall be engaged as arbitrator hereunder to settle such Dispute as soon as practicable.  The Arbitrating Accountant's determination with respect to any Dispute shall be final and binding upon the parties hereto.  Seller and Purchaser shall each pay one-half of the fees and expenses of the Arbitrating Accountant with respect to any Dispute.  Upon the resolution of all Disputes, the Closing Date Balance Sheet shall be revised to reflect such resolution.

(d)     Adjustment Amount.  Purchaser and Seller acknowledge and agree that the Purchase Price was determined and agreed to by the parties based in part on the Seller's Balance Sheet of April 30, 2006 (the "April Balance Sheet") which, among other things, reflected Seller's inventories and work in process in the amount of $350,000, office fixtures, machinery and equipment and leasehold improvements in the amount of $275,000, and accounts receivable in the amount of not less than $1,900,000, for a total of $2,525,000 (the "Assets Amount") and accounts payable in the amount of $1,200,000 (the "Liabilities Amount").  In the event that the Assets Amount less the Liabilities Amount (the "Net Assets Amount") as set forth on the Closing Balance Sheet is in excess of $1,325,000 (the "Target Amount"), then the Purchase Price shall be adjusted upward by the amount by which the Net Assets Amount shall exceed the Target Amount and the difference (the "Positive Adjustment Amount") shall be paid by Purchaser as set forth herein.  On the Closing Date, the Seller shall deliver to the Purchaser a true, correct and complete copy of the Accounts Receivable of the Company as of the Closing Date (the "Closing Date Accounts Receivable").  On the 30th day after the Closing Date and on the last day of each of the next 15-ten (10) day periods the (the "Collection Period"), the Purchaser shall pay to the Seller the amount by which the Collections (as herein defined) of the Closing Date Accounts Receivable exceeds the sum of (x) $1,900,000 and (y) the prior payments of such Collections made during the Collection Period. In the event that the Net Assets Amount is less than the Target Amount, the amount of such difference (the "Negative Adjustment Amount") shall be deemed to be a downward adjustment of the Purchase Price and shall be promptly paid by Seller to Purchaser by wire transfer to an account specified by Purchaser and if not paid in full upon demand shall be offset

7

against the Note which shall be reduced by such amount and reissued in the lesser amount with payments adjusted to reflect the reduced principal amount thereof. In the event that any of the Closing Date Accounts Receivable remain outstanding as of the last day of the Collection Period, Seller shall pay to Purchaser the amount thereof. Purchaser shall use reasonable efforts to collect such Receivables and shall pay over to Seller any net recoveries thereof after deduction for costs of collection and a reasonable administrative fee which shall not exceed in the aggregate five percent (5%) of the amount of such recoveries. For purposes hereof, Collections shall mean the amounts received in good funds in payment of the Closing Date Accounts Receivable and are not subject to setoff, adjustment or recoupment in any proceeding or otherwise.

2.3    Closing. The consummation of the purchase and sale of the Shares in accordance with this Agreement (the "Closing") shall commence at 10:00 a.m., local time, at such place as the parties shall mutually determine on the second Business Day after all of the conditions precedent to Closing hereunder shall have been satisfied or waived, or at such other time and place as the Parties shall agree upon in writing. The date of the Closing is referred to as the "Closing Date." The Parties shall deliver at the Closing such documents, certificates of officers and other instruments as are set forth in Article VI hereof and as may reasonably be required to effect the transfer by Seller of the Shares pursuant to and as contemplated by this Agreement and to consummate the Acquisition. All events occurring at the Closing shall be deemed to occur simultaneously (with the concurrent delivery of the documents required to be delivered pursuant to Article VI and payment of the Purchase Price).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Purchaser to enter into this Agreement and to consummate the Acquisition, Seller represents and warrants to Purchaser as follows:

3.1    Title to Shares. Seller has good and valid legal and beneficial title to the Shares, free and clear of any Lien. Seller is not a party to or bound by any options, calls, contracts or commitments of any character relating to any issued or unissued interests in the Company or any other debt or equity security issued or to be issued by the Company, including any agreement, instrument or understanding, order or decree that would restrict the transfer by Seller of the Shares pursuant to this Agreement.

3.2    Capitalization.

(a)    The Shares constitute all of the issued and outstanding shares of capital stock of the Company, all of which are held beneficially and of record by Seller. All of the Shares have been duly authorized and validly issued and are fully paid and non-assessable and were offered, issued and sold by the Company in compliance with applicable federal and state securities laws.

(b)    (i) No subscription, warrant, option, convertible security or other right (contingent or otherwise) to purchase or acquire any shares of stock of the Company is

646533-4

8

authorized or outstanding, (ii) the Company has no obligation (contingent or otherwise) to issue any subscription, warrant, option, convertible security or other such right or to issue or distribute to holders of any of its shares of stock any evidences of indebtedness or assets of the Company except with respect to the Excluded Assets, (iii) the Company has no obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any of its shares of stock or to pay any dividend or make any other distribution in respect thereof and (iv) there are no outstanding or authorized stock appreciation rights, phantom stock or similar rights with respect to the Company.

3.3     Organization and Qualification. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois and has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on the Business as it is now being conducted. The Company is not qualified or licensed to do business, and is not required to be qualified or licensed to do business, in any jurisdiction other than the State of Illinois. The Company and Seller made a valid election in 1991 for the Company to be subject to the provisions of Subchapter S of the Code, and the Company has, since the date of such election, maintained its qualified status as a Subchapter S corporation.

3.4     Authority. Each of Seller and the Company has all necessary power and authority to execute and deliver this Agreement and the other Transaction Documents to which she or it is a party and to perform her or its respective obligations hereunder and thereunder. The execution and delivery of this Agreement and each other Transaction Document to which she or it is a party and the consummation by Seller and the Company of the Acquisition have been duly and validly authorized by all necessary corporate action on the part of the Company, and no other proceedings on the part of Seller or the Company are necessary to authorize this Agreement or such other Transaction Documents or to consummate the Acquisition. This Agreement and such other Transaction Documents have been or will be duly executed and delivered by Seller and the Company and, assuming the due authorization, execution and delivery by Purchaser, this Agreement constitutes, and each other Transaction Document to which Seller or the Company is a party upon execution will constitute, a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, subject to the effect of any applicable bankruptcy, moratorium, insolvency, reorganization or other similar law affecting the enforceability of creditors' rights generally and to the effect of general principles of equity which may limit the availability of remedies (whether in a proceeding at law or in equity).

3.5     No Conflict. The execution and delivery of this Agreement and each of the Transaction Documents to which it is a party by Seller and the Company do not, and the performance by Seller and the Company of their respective obligations hereunder and the consummation of the Acquisition will not:  (a) conflict with or violate any provision of the articles of incorporation or by-laws of the Company; (b) assuming that all filings and notifications described in Section 3.6 have been made, conflict with or violate any law or order applicable to Seller or the Company or by which any of the Company's assets or Seller's ownership of the Shares is bound or affected; or (c) result in any breach of or constitute a default under, or require notice or consent under, any mortgage, indenture, deed of trust, lease, contract, agreement, license or other instrument to which Seller or the Company is a party or by which any of the Company's assets is bound or affected or result in the creation of a Lien other than a Permitted Lien on any of the Company assets.

3.6     Required Filings and Consents.  The execution and delivery of this Agreement and each of the Transaction Documents to which it is a party by Seller and the Company do not, and the performance by Seller and the Company of their respective obligations hereunder and the consummation of the Acquisition will not, require any consent, approval, authorization or permit of, or filing by Seller or the Company with or notification by Seller or the Company to, any Governmental Authority or any other Person not a party to this Agreement, except for the consents, approvals, authorizations, declarations or rulings set forth on Schedule 3.6.

3.7     Financial Statements.  Except as disclosed therein or in Schedule 3.7, the Financial Statements are true, correct and complete and have been prepared on a tax accounting basis, consistently applied.  The Financial Statements fairly present in all material respects the financial position and result of operations of the Company as of the dates and, with respect to the income statements included in the Financial Statements, for the periods indicated, except for normal year-end adjustments consistent with past practice.

3.8     Absence of Undisclosed Liabilities.  The Company does not have any obligations or liabilities (whether accrued, absolute, contingent, accrued or otherwise, whether due or to become due and regardless of by whom asserted) arising out of any transaction entered at or prior to the date hereof or any action or inaction of the Company at or prior to the date hereof) in respect of the Business other than (a) the liabilities disclosed on Schedule 3.8; (b) liabilities under any of the Transaction Documents; and (c) liabilities reflected in the Financial Statements delivered to Purchaser prior to the date hereof.

3.9     Absence of Certain Changes or Events.  From December 31, 2005 to the date hereof, except as contemplated by this Agreement or disclosed on Schedule 3.9, the Company has conducted the Business in the ordinary course of business in all material respects, and:

(a)     there has not been any damage to or destruction or loss in excess of $10,000 in the aggregate of the assets, properties, rights or interests of the Company used in the Business, whether or not covered by insurance;

(b)     the Company has not sold or transferred any of its assets, properties, rights or interests used in the Business, other than sales of inventory and disposal of obsolete, damaged or defective assets in the ordinary course of business consistent with past practice;

(c)     the Company has not increased the salary, bonus or other compensation payable to any current or former officer, employee, manager or director of the Company other than in the ordinary course of business consistent with past practice;

(d)     the Company has not hired any employees, except in the ordinary course of business and consistent with past practice;

(e)     the Company has not (i) entered into any new, or amended any existing, Benefit Plan (whether written or oral), except to the extent required by applicable law, or (ii) amended or altered any severance pay practices;

(f)     the Company has not entered into, modified or terminated any Contract involving a total remaining commitment of at least $10,000 other than in the ordinary course of

business and consistent with past practice, or received written notice of termination of any Material Contract;

(g)    the Company has not waived, released or canceled any material claims against third parties or material debts owing to the Company other than credits, payments or adjustments in an amount less than $10,000 in the aggregate made for customers or suppliers in the ordinary course of business consistent with past practice;

(h)    the Company has not made or committed to make any capital expenditures or capital additions or betterments in excess of $10,000, whether individually or as a part of related transactions;

(i)    the Company has not disposed of any Company Intellectual Property or permitted the lapse in registration of any Intellectual Property owned by the Company which, in either case, is material to the conduct of the Business in the ordinary course;

(j)    the Company has not changed its accounting methods, systems, policies, principles or practices;

(k)    except as set forth in the Interim Statements, the Company has not incurred indebtedness (other than for trade payables in the ordinary course of business consistent with past practice);

(l)    the Company has not assumed or guaranteed (whether directly, contingently or otherwise) the obligations of any other Person other than by endorsement of checks in the ordinary course of business consistent with past practice;

(m)    the Company has not acquired or leased any assets valued, in the aggregate, in excess of $10,000, other than in the ordinary course of business and consistent with past practice;

(n)    the Company has not suffered or permitted the creation of any Lien other than Permitted Liens over any of its assets other than in the ordinary course of business and consistent with past practice;

(o)    the Company has not entered into any discussions, negotiations or any agreement with respect to any collective bargaining agreement or union representation of any of the Company's employees;

(p)    the Company has not entered into any Contract with any of its Affiliates, members, managers, directors, officers or employees, or any of the respective Affiliates of such individuals other than Contracts with Affiliated entities on terms entered into in the ordinary course of business which are comparable to the terms available for the relevant goods, services, assets or property from unaffiliated third parties;

(q)    the Company has not declared, set aside or paid any dividend or distribution (whether in cash or property) except with respect to the Excluded Assets and except

646533-4

11

with respect to a distribution to pay any tax liability arising from the conduct of the Company's business;

    (r)    the Company has not amended the Articles of Incorporation or Bylaws of the Company or made any changes in its issued and outstanding shares of capital stock;

    (s)    the Company has not entered into any agreement to take any of the actions set forth in subsections (b) through (r) of this Section 3.9; and

    (t)    the Company has not suffered a Material Adverse Effect.

3.10    Real Property.

    (a)    The Company has no ownership interest in any real property, other than leasehold interests and no interest in, or any right or obligation to acquire any interest in, any other real property. Schedule 3.10(a) hereto correctly identifies all real property currently leased or otherwise occupied by the Company (the "Leased Real Property"). With respect to the Leased Real Property, Seller has delivered to Purchaser true, correct and complete copies of all real estate leases to which the Company is a party (including subleases and prime leases, if any, affecting each parcel of the Leased Real Property) or other occupancy arrangements to which the Company is a party, including any amendments thereto (collectively referred to as the "Leases" and individually as a "Lease").

    (b)    Except as set forth in Schedule 3.10(b):

    (i)    The Company's interest in the Leased Real Property is the lessee's interest under a valid and binding Lease;

    (ii)    Each Lease delivered to Purchaser represents the entire agreement by and between the landlord under said Lease and the Company relating to the leasing of that parcel of the Leased Real Property by such landlord to the Company;

    (iii)    Neither the Company nor, any landlord under a Lease is in default in any material respect under the terms of its Lease, and no state of facts exist which, with the passage of time or the giving of notice, or both, would constitute a default by the Company, by the landlord under any Lease;

    (iv)    The Company is not in arrears in any of its obligations for labor and materials and other services in connection with construction work, if any, and any other work performed in, on or about the Leased Real Property by the Company;

    (v)    Neither Seller nor the Company has any knowledge of, and has not received any notice of any present violation of, any federal, state, county or municipal law, regulation, ordinance, order or directive relating to the use or condition of the Leased Real Property; and

(vi)    Neither Seller nor the Company has any knowledge of, or has received any notice of, any assignment, hypothecation or pledge by any landlord of any Lease or the rentals thereunder.

3.11    Intellectual Property.    Schedule 3.11 sets forth a true and complete list of the Company Intellectual Property. Except as disclosed on Schedule 3.11:

(a)    All Company Intellectual Property (other than Intellectual Property that the Company licenses from third parties) is owned by the Company, free and clear of all Liens other than Permitted Liens, and no Company Intellectual Property is subject to any license, royalty or other agreement. The Company has not received or granted any license or agreed to pay or receive any royalty in respect of any Company Intellectual Property, and the Company is not bound by any agreement pursuant to which it has agreed to indemnify any Person in connection with the use of the Company Intellectual Property. All registration and maintenance fees that have become due and payable to any Governmental Authority with respect to any Company Intellectual Property (other than Intellectual Property that the Company licenses from third parties) for which a registration has been issued have been paid, and no act or omission has occurred to cancel, impair, dedicate to the public or entitle any Governmental Authority to cancel, modify, forfeit or hold abandoned any such Company Intellectual Property. The Company owns or has a right to use all Intellectual Property historically uses to conduct the Business as presently conducted.

(b)    Each process, method, design or other Company Intellectual Property the Company practices, and to Seller's knowledge, the products sold by the Company and the marketing used by the Company in connection which such products or services do not infringe any Intellectual Property of another. The Company has not received any notice contesting its right to make, use, sell, copy, distribute or otherwise exploit the Company Intellectual Property.

(c)    Each of the Company and Seller has taken commercially reasonable steps to safeguard the secrecy of the confidential information and trade secrets included in the Company Intellectual Property such that no material rights in information have been lost during the five (5) year period prior to the date hereof.

(d)    To the knowledge of Seller, no third party is engaged in, or has engaged in, any infringement or misappropriation of any Company Intellectual Property.

3.12    Contracts.

(a)    Schedule 3.12(a) sets forth a list of the following Contracts pertaining to the Business to which the Company is a party or is bound as of the date hereof:

(i)    any Contract having an aggregate value in excess of $50,000 or that is otherwise material and is not terminable on notice of thirty (30) days or less;

(ii)    any Contract with any employee, officer, manager or director of the Company having an aggregate value in excess of $50,000;

(iii)    any consulting agreement having an aggregate value in excess of $50,000;

(iv)    any trust indenture, mortgage, promissory note, loan agreement or other Contract relating to the borrowing of funds, an extension of credit or financing or the pledging of assets, other than trade payables incurred in the ordinary course of business;

(v)    any Contract limiting the freedom of the Company to engage in any line of business or to compete with any other Person, or any confidentiality, secrecy or non-disclosure Contract not made in the ordinary course of business;

(vi)    any agreement of guarantee, support, indemnification, assumption or endorsement of, or any similar commitment with respect to, the liabilities of any other Person in an amount in excess of $10,000 in the aggregate, other than endorsement of checks and customer agreements made in each case in the ordinary course of the Business and consistent with past practice;

(vii)    any Contract providing for a joint venture or partnership with any other Person;

(viii)    any collective bargaining agreement;

(ix)    any Contract with a sales representative, manufacturer's representative, distributor, dealer, broker, sales agency, advertising agency or other Person engaged in sales, distributing or promotional activities, or any Contract to act as one of the foregoing on behalf of any Person;

(x)    any "take or pay" Contract (which requires the Company to pay for goods whether or not accepted from a supplier);

(xi)    any derivative and/or hedging Contract;

(xii)    any Contract with any Governmental Authority having an aggregate value in excess of $10,000;

(xiii)    any power of attorney or agency agreement pursuant to which a Person other than Seller or an officer of the Company is granted the authority to act for or on behalf of the Company, or the Company is granted the authority to act for or on behalf of any Person;

(xiv)    any Contract relating to the Computer System having an aggregate value in excess of $10,000;

(xv)    any Contract for capital improvements or expenditures having an aggregate value in excess of $10,000; and

(xvi) any Contract or arrangement involving any restrictions with respect to the geographical area of operations or scope or type of business of the Company.

(b)    Except as set forth on Schedule 3.12(b): (i) all of the Material Contracts are in full force and effect and constitute the legal, valid and binding obligations of the Company and, to the knowledge of Seller, the other parties thereto; (ii) all of the Material Contracts are enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of creditors generally and by equitable limitations on the availability of specific remedies; (iii) no termination notice has been delivered by or to the Company with respect to any Material Contract; (iv) the Company is not in breach of or default under the terms of any Material Contract and to the knowledge of Seller, no event has occurred or circumstance exists which with notice or lapse of time or both, would constitute a breach of or default under any such Material Contract; and (v) to the knowledge of Seller, no other party to any such Material Contract is in material breach or default under any such Material Contract.  The Company has delivered to Purchaser true and complete copies of each Material Contract and an accurate written description in reasonable detail of any Material Contract not reduced to writing.

3.13    Permits.  Schedule 3.13 sets forth a list of all Permits held by the Company.  No authorizations of any Governmental Authority other than the Permits are required in order for the Company to conduct the Business as it is now being conducted.  Each Permit is in full force and effect and will remain in full force and effect following the Closing.  The Company is not in conflict in any material respect with or in material default or violation of any Permit.  The Permits include all licenses, permits, approvals, franchises, certificates, consents, and other authorizations of any Governmental Authority required for the operation of the Business as presently conducted.

3.14    Compliance with Laws.  The Company is not in conflict with or in default or violation of any law applicable to the Company or the Business and no event has occurred or circumstance exists which, with or without notice or lapse of time or both, would constitute a violation or default of any law applicable to the Company, the violation of which would have a material adverse effect upon the conduct or operations of the Company's business, assets or properties.  No notice from any Governmental Authority has been received by the Company or Seller claiming any violation of any applicable law or requiring any work, construction or expenditure, or asserting any Tax, assessment or penalty.

3.15    Litigation.  Except as disclosed in Schedule 3.15, there are no actions, suits, arbitrations, regulatory proceedings or other litigation, proceedings or governmental investigations pending or, to the knowledge of Seller, threatened against or affecting the Company or any of its officers, directors, managers, employees, agents or members in their capacity as such, or any of its properties or businesses.  Schedule 3.15 includes a complete and accurate list of all pending actions asserted by the Company.  Except as disclosed in Schedule 3.15, the Company is not subject to (a) any order, judgment, decree, injunction, stipulation or consent order of or with any court or other Governmental Authority or (b) any settlement agreement with any Governmental Authority or other Person, the terms of which have not been fully performed prior to the date hereof.  The Company has not entered into any

agreement to settle or compromise any proceeding pending or threatened against it. There are no claims, actions, suits, proceedings or investigations pending or, to the knowledge of Seller, threatened by or against the Seller and the Company relating to this Agreement, the Transaction Documents or the Acquisition.

3.16    Employment Matters. Prior to the execution and delivery of this Agreement, the Company has delivered to Purchaser a true, complete and accurate list (the "Key Employee List") as of a recent date of the names, titles, current status (active or on leave of absence), annual compensation and all bonuses and similar payments made for the year ended December 31, 2005 for each Person who is a director, manager, officer or other employee of the Company on the date hereof whose annual compensation exceeded $50,000 for the year ended December 31, 2005. Except as disclosed on Schedule 3.16: (a) there is no, and during the past two years there has been no, labor strike, picketing, slow-down, work stoppage or grievance filing or proceeding actually pending or, to the knowledge of Seller, threatened against or involving the Company; and (b) the Company has not received notice that any of the employees listed on the Key Employee List intends to terminate his employment with the Company or would not be willing to work for Purchaser. No employee is represented by a union, labor organization or collective bargaining unit certified by the NLRB. Within the five (5) year period prior to the date hereof, no representation election petition has been filed by any employee (in his capacity as an employee of the Company) or is pending with the NLRB and no union organizing campaign involving or affecting any employee has occurred, is in progress or is threatened. Within the five (5) year period prior to the date hereof, no NLRB unfair labor practice charge (or litigation alleging such claim) has been filed or threatened or is presently pending against the Company relating to an employee. Within the five (5) year period prior to the date hereof, no grievance or arbitration demand, whether or not filed pursuant to a collective bargaining contract, with respect to an employee has been filed or threatened or is pending against the Company. No employee of the Company has any contractual right to continued employment with, or retention by, the Company. The Company has complied and is in compliance in all material respects with all laws relating to labor and employment practices, including all laws relating to terms and conditions of employment, wages, hours, collective bargaining, workers' compensation, occupational safety and health, equal employment opportunity and immigration, and are not engaged in any unfair labor or unlawful employment practice. The execution of this Agreement or any other Transaction Document and the consummation of any transaction contemplated hereby or thereby shall not cause the Company to incur or suffer any liability for severance, termination or other payments to any employee.

3.17    Employee Benefits. Schedule 3.17 contains a complete list, as of the date hereof, of each Benefit Plan. Except as set forth on Schedule 3.17, the Company has provided or made available to Purchaser true and complete copies of each Benefit Plan sponsored or maintained by the Company or in which the Company participates and with respect to any Benefit Plan that is sponsored by the Company (a "Company Sponsored Benefit Plan") all contracts relating thereto, or to the funding thereof, including, without limitation, all trust agreements, insurance contracts, administration contracts, investment management agreements, subscription and participation agreements and recordkeeping agreements, each as in effect on the date hereof. In the case of any Company Sponsored Benefit Plan that is not in written form, the Purchaser has been supplied with an accurate written description of such Company Sponsored Benefit Plan as in effect on the date hereof. A true and correct copy of the most recent annual report, actuarial

report, accountant's opinion of the plan's financial statements, summary plan description and Internal Revenue Service determination letter with respect to each Company Sponsored Benefit Plan, to the extent applicable, has been supplied to the Purchaser, and there have been no materially adverse changes in the financial condition in the respective plans from that stated in the annual reports and actuarial reports supplied.

Except as disclosed on Schedule 3.17:

(a)    All Benefit Plans have been maintained and administered in form and in operation in all material respects in accordance with their terms and with all applicable requirements of law (including, in the case of any Benefit Plan which is an employee pension benefit plan, the requirements of sections 401(a) and 501(a) of the Code), and no notice issued by any governmental authority questioning or challenging such compliance has been received by the Company and, to the knowledge of the Seller, no event has occurred which could reasonably be expected to cause any Benefit Plan to fail to comply with such requirements.

(b)    Each Benefit Plan which is an employee pension benefit plan intended to qualify under Code section 401(a) is the subject of a favorable determination letter issued by the IRS with respect to the qualified status of such plan under section 401(a) of the Code and the tax-exempt status of any trust which forms a part of such plan under section 501(a) of the Code; all amendments to any such plan for which the remedial amendment period (within the meaning of section 401(b) of the Code and applicable regulations) has expired are covered by a favorable IRS determination letter.

(c)    None of the assets of any Benefit Plan are invested in employer securities or employer real property.

(d)    There have been no "prohibited transactions" (as described in section 406 of ERISA or section 4975 of the Code) with respect to any Benefit Plan and the Company has not engaged in any prohibited transaction.

(e)    There have been no acts or omissions by the Company or any of its ERISA Affiliates which have given rise to material fines, penalties, taxes or related charges under section 502 of ERISA or Chapters 43, 47, 68 or 100 of the Code for which the Company may be liable.

(f)    None of the payments contemplated by the Benefit Plans would, with respect to any employees of the Company, in the aggregate, constitute excess parachute payments (as defined in section 280G of the Code (without regard to subsection (b)(4) thereof)).

(g)    There are no actions, suits or claims (other than routine claims for benefits) pending or, to the knowledge of Seller, threatened involving any Benefit Plan or the assets thereof and no facts exist which could give rise to any such actions, suits or claims (other than routine claims for benefits).

(h)    With respect to any Benefit Plan that is subject to Title IV of ERISA: (i) there has been no reportable event (as described in section 4043 of ERISA); (ii) no steps have been taken to terminate any such plan; (iii) there has been no withdrawal (within the meaning of

646533-4

17

section 4063 of ERISA) of a "substantial employer" (as defined in section 4001(a)(2) of ERISA); and (iv) no event or condition has occurred which would reasonably be expected to constitute grounds under section 4042 of ERISA for the termination of or the appointment of a trustee to administer any such plan.

(i)     The Company has no liability or contingent liability for providing, under any Benefit Plan or otherwise, any post-retirement medical or life insurance benefits, other than statutory liability for providing group health plan continuation coverage under Part 6 of Title I of ERISA and section 4980B of the Code or applicable state law.

(j)     There has been no act or omission that would impair the ability of the Company (or any successor thereto) to unilaterally amend or terminate any Benefit Plan.

(k)     The Company does not contribute to, has not contributed to, nor has any liability, contingent or otherwise, with respect to a "multiemployer plan", as such term is defined in Section 3(37) of ERISA.

3.18    Finder.  Neither Seller nor the Company has agreed to pay to any broker, finder, investment banker or any other Person a brokerage, finder's or other fee or commission in connection with any Transaction Document or the Acquisition except Gregory Financial Group LLC which shall be the sole responsibility of Seller.

3.19    Taxes and Tax Returns.  Except as set forth on Schedule 3.19:

(a)     The Company has timely filed or timely requested extensions to file those Tax Returns which are currently due or, if not yet due, will timely file or timely request extensions to file all Tax Returns required to be filed by it for all Taxable periods ending on or before the Closing Date, and all such Tax Returns are, or will be when filed, true, correct and complete in all material respects;

(b)     The Company has paid to the appropriate Governmental Authority, or, if payment is not yet due, will pay to the appropriate Governmental Authority, all Taxes reflected on the Company's Tax Returns as due and payable for all Taxable periods ending before the Closing Date;

(c)     The Company has no liability for Taxes other than the amounts reflected on the Tax Returns or properly accrued on the books and records of the Company with respect to Tax Returns which are not yet due and which related to the period on or before the Closing Date; and

(d)     All Taxes that are required by law to be withheld or collected by the Company have been duly withheld or collected and, to the extent required, have been paid over to the proper governmental authority or are held in separate bank accounts for such purpose.

3.20    Customers and Suppliers.  Schedule 3.20 sets forth a list of the customers of the Company during calendar year 2005 through September 13, 2006 and a list of suppliers of the Company during calendar year 2005 through September 13, 2006.  The ten (10) largest customers of the Company in terms of revenue during the 2005 calendar year and through

646533-4

18

Closing Date shall, for purposes of this Section 3.20 be referred to as the "Major Customers". The ten (10) largest suppliers of the Company in terms of purchases by the Company during the 2005 calendar year and through the Closing Date shall, for purposes of this Section 3.20 be referred to as the "Major Suppliers". Except to the extent set forth in Schedule 3.20, since January 1, 2006, there has not been any dispute of the Company with any Major Customer or Major Supplier involving in excess of $5,000. No Major Customer or Major Supplier has notified the Company that any such Major Customer or Major Supplier intends to reduce its purchases from or sales to (as the case may be) the Company and the Company has not received any notice of termination or non-renewal of any contract in excess of $5,000 with any of its Major Customers or Major Suppliers, and neither the Company nor Seller has knowledge of any facts or circumstances that would form the basis of a material dispute or cause for dissatisfaction with or by any such Major Customer or Major Supplier. True, correct and complete copies of all such dispute or termination notices (or a written description of any oral dispute or termination notice) have been delivered to Purchaser prior to the date hereof).

3.21   Subsidiaries. The Company does not own, or have any contract or other right to acquire, directly or indirectly, any capital stock or other equity securities of any corporation or other entity, nor does the Company have any direct or indirect equity or ownership interest in any business other than the Business.

3.22   Insurance. Schedule 3.22 sets forth a list of each insurance policy that is currently maintained by the Company with respect to the Business. All of such insurance policies are in full force and effect, and the Company is not in material default with respect to its obligations under any such insurance policies. The Company has not been denied insurance coverage for any policy that it has attempted to obtain in the past two years, for which it was unable to obtain comparable coverage.

3.23   Title to and Sufficiency of Assets. Except as set forth on Schedule 3.23, the Company has, and will have upon the purchase of the Shares by Purchaser, good and marketable title to, or a valid leasehold interest in, all tangible personal property and intangible assets used by it in the operation of the Business as presently conducted (other than the Excluded Assets), free and clear of any Lien other than Permitted Liens. Such assets constitute all the assets, properties and rights that are currently used in connection with the conduct of the Business as it is presently conducted and has been conducted since December 31, 2005.

3.24   Tangible Assets. All of the material tangible assets used in the conduct of the Business which constitute personal property of the Company, whether owned or leased by the Company, are in good operating condition and repair (with the exception of normal wear and tear). The Company has not deferred necessary capital expenditures or maintenance and repair. Contemporaneously with the execution and delivery of this Agreement, Seller shall deliver to Purchaser a depreciation schedule of recent date listing the material tangible operating assets of the Company. Except as set forth on Schedule 3.24, the Company owns all such tangible operating assets free and clear of all Liens other than Permitted Liens.

3.25   Accounts Receivable. Except as set forth on Schedule 3.25, (a) each Account Receivable represents a sale made in the ordinary course of business for a bona fide sale of goods or for services performed and none of the Accounts Receivable has been pledged or

646533-4

19

otherwise used as collateral, (b) the Company has performed all of its obligations to produce, process or otherwise provide the goods or perform the services to which such Account Receivable relates, (c) the Company has not received advance payment, in whole or in part, from any customer with respect to goods or services of the Company that will be produced or provided, as the case may be, after the Closing Date; and (d) the Accounts Receivable are collectible in full within sixty (60) days of the invoice date of each such Account Receivable and are subject to retainage as set forth on the Closing Date Accounts Receivable

3.26   Inventory.  Except as set forth on Schedule 3.26, (a) the Inventory constituting raw materials and supplies is usable in the ordinary course of business; (b) the Inventory constituting finished products is of merchantable quality and is saleable in the ordinary course of business at normal (nondiscounted) selling prices; (c) none of the Inventory has been pledged or otherwise given as collateral or is held by the Company on assignment or consignment; and (d) the Inventory is reflected on the Year 2005 Financial Statements at the lower of cost or net realizable value.  The Inventory of the Company is held in quantities that are reasonable in light of historic sales levels of the Business of the Company.

3.27   Bank Accounts.  Schedule 3.27 sets forth the name and location of each financial institution at which the Company has an account or safe deposit box and, with respect to each such account or safe deposit box, the account or box number and the names of all persons authorized to draw thereon or have access thereto.

3.28   Computer System.  Except as disclosed in Schedule 3.28, the software included in the Computer System is in material conformance with all agreements pursuant to which the Company received a license to the same.  The Company owns or has valid licenses to use the Computer System, including all software comprising a part thereof, and there are no defects in the same that have interrupted the Company's operations within the past 12 months.  To Seller's best knowledge, the use of the Computer System (including any software modifications) by the Company has not violated or infringed upon the rights of any third parties, and the sale of the Shares to Purchaser will not result in the termination of any maintenance, service or support agreement relating to any part of the Computer System or any reduction in the services provided to the Business, warranties available to the Business or rights of the Business thereunder.

3.29   Environmental.

(a)   Schedule 3.29(a) identifies all locations of real property previously or currently owned, operated or occupied by the Company (the "Real Property").

(b)   Except as set forth on Schedule 3.29(b) hereto, with respect to the Business, the Real Property and the operations of the Company, the Company has complied with, and is currently in material compliance with, all applicable Environmental Laws, and the Company has not received any notice, report or information regarding any violation of, or any liability (whether accrued, absolute, contingent, unliquidated or otherwise) or corrective, investigatory or remedial obligation arising under, applicable Environmental Laws.

(c)   Neither this Agreement nor the consummation of the transactions contemplated by this Agreement shall impose any obligation on Seller, the Company or

Purchaser for site investigation or cleanup or notification to, or requiring the consent of, any government agency or third party under any Environmental Law (including any so-called "transaction-triggered" or "responsible property transfer" laws and regulations).

(d)    Except as set forth on <u>Schedule 3.29(d)</u> hereto, there has been no release of any Hazardous Substance (as hereinafter defined) at, upon or under any Real Property in any manner, or in any amount, that violates any applicable Environmental Law and that has not previously been fully and completely remediated, or which has or will in the future give rise to any liabilities, obligations or costs.

(e)    Except as set forth on <u>Schedule 3.29(e)</u> hereto, the Company has never owned or operated and does not own or operate any above-ground or underground storage tank on any parcel of the Real Property and, no above-ground or underground storage tank exists or to Seller's knowledge, ever has existed on any parcel of the Real Property.

(f)    Except as set forth on <u>Schedule 3.29(f)</u> hereto, the Company:

(i)    has not conducted or authorized the use, generation, transportation, storage, treatment, or disposal of any Hazardous Substance at any parcel of the Real Property, except in compliance with all applicable Environmental Laws;

(ii)    to Seller's best knowledge, has not handled, treated, stored, transported, released or disposed of any Hazardous Substance at any off-site location in violation of any applicable Environmental Laws or in any manner which has or will in the future give rise to any liabilities, obligations or costs;

(iii)    has no knowledge of the migration (by any medium) of any Hazardous Substance from any parcel of the Real Property onto any neighboring property or from any neighboring property onto any parcel of Real Property;

(iv)    has no knowledge of any pending or threatened litigation, proceeding, claim, complaint or information request in which any person or entity alleges the presence, release, threat of release, placement or disposal of any Hazardous Substance on or in any parcel of the Real Property, the generation, transportation, storage, treatment or disposal of any Hazardous Substance at any parcel of the Real Property or the migration (by any medium) of any Hazardous Substance from any parcel of the Real Property to another parcel of real property;

(v)    has not received, and is not aware of, any notice that any governmental entity or third party has determined, or may determine, that the presence, release, threat of release or placement of any Hazardous Substance on or in any parcel of the Real Property, or the generation, transportation, storage, treatment or disposal of any Hazardous Substance at any parcel of the Real Property, violates or requires remediation under an applicable Environmental Law; and

(vi)    has not received any communication from, or entered into any agreement with, any governmental entity or any other person or entity with

646533-4

21

respect to the presence, release, threat of release or placement of any Hazardous Substance on, in or under any parcel of the Real Property, or the generation, transportation, storage, treatment or disposal of any Hazardous Substance at any parcel of the Real Property.

(g)    Without limiting the generality of the foregoing, to Seller's best knowledge, no facts, events or conditions existing on the Closing Date and relating to any parcel of Real Property, the Business or the past or present facilities or operations of the Company, shall prevent, hinder or limit continued compliance with applicable Environmental Laws, give rise to any corrective, investigatory or remedial obligation pursuant to applicable Environmental Laws, give rise to any other liability (whether accrued, absolute, contingent, unliquidated or otherwise) pursuant to Environmental Laws (including those liabilities relating to onsite or offsite releases or threatened releases of Hazardous Substances, personal injury (including death), property damage or natural resources damage), or give rise to any other liabilities, obligations or costs relating to Environmental Matters (as hereinafter defined) under applicable Environmental Laws.

(h)    Since December 31, 1993 no environmental lien has attached to any parcel of Real Property.

3.30    <u>Prior Prospective Purchasers</u>.  Except as set forth on Schedule 3.30, each person or entity with whom Seller or the Company engaged in discussions as a prospective purchaser of the stock or assets of the Company at any time subsequent to December 31, 2000 executed and delivered to Seller or the Company a confidentiality and nondisclosure agreement and no such person or entity has any rights to purchase the assets or stock of the Company..

3.31    <u>Certain Payments</u>.   There has been no payment made or other consideration provided directly or indirectly by Seller or the Company to any agent, consultant, employee or representative of any customer or supplier or other person or entity which has not been in payment of bona fide fees and commissions, and no bribes, kickbacks or illegal or improper payments have been made, or other consideration provided which, if any, would have an adverse effect upon the Business subsequent to the Closing.

3.32    <u>Accuracy of Statements</u>.  This Agreement (including the schedules and exhibits referenced herein) does not contain and will not contain any untrue statement of a material fact and does not omit and will not omit to state a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they are made, not misleading.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Seller and the Company to enter into this Agreement and to consummate the Acquisition, Purchaser represents and warrants to Seller and the Company as follows:

4.1    <u>Organization and Qualification.</u>  Purchaser is a corporation, duly organized, validly existing and in good standing under the laws of the State of Illinois.

4.2    <u>Authority Relative to this Agreement.</u>  Purchaser has all necessary corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to perform its obligations hereunder and to consummate the Acquisition.   The execution and delivery of this Agreement and such other Transaction Documents by Purchaser and the consummation by Purchaser of the Acquisition have been duly and validly authorized by all necessary corporate action on the part of Purchaser, and no other corporate proceedings on the part of Purchaser are necessary to authorize this Agreement or to consummate the Acquisition. This Agreement and such other Transaction Documents have been or will be duly executed and delivered by Purchaser and, assuming the due authorization, execution and delivery by Seller and the Company, this Agreement constitutes, and each other Transaction Document upon execution will constitute, a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to the effect of any applicable bankruptcy, moratorium, insolvency, reorganization or other similar law affecting the enforceability of creditors' rights generally and to the effect of general principles of equity which may limit the availability of remedies (whether in a proceeding at law or in equity).

4.3    <u>No Conflict.</u>  The execution and delivery of this Agreement by Purchaser do not, and the performance by Purchaser of its obligations hereunder and the consummation of the Acquisition will not:    (a) conflict with or violate any provision of the certificate of incorporation or by-laws of Purchaser; (b) assuming that all filings and notifications described in <u>Section 4.4</u> have been made, conflict with or violate any law or order applicable to Purchaser or by which Purchaser or any of its assets or properties is bound or affected; or (c) result in any breach of or constitute a default under, or require notice or consent under, any mortgage, indenture, deed of trust, lease, contract, agreement, license or other instrument to which Purchaser is a party or by which Purchaser's assets or properties are bound, or result in the creation of a material Lien on any asset or property of Purchaser, except in the case of clauses (b) and (c), for any conflict, violation, breach or default that would not reasonably be expected to have a material adverse effect on Purchaser.

4.4    <u>Required Filings and Consents.</u>  The execution and delivery of this Agreement by Purchaser do not, and the performance by Purchaser of its obligations hereunder and the consummation of the Acquisition will not, require any consent, approval, authorization or permit of, or filing by Purchaser with or notification by Purchaser to, any Governmental Authority, except for such consents, approvals, authorizations, permits and filings the failure of which to obtain would not reasonably be expected to have a material adverse effect on Purchaser.

4.5    <u>No Finder.</u>  Purchaser has not agreed to pay to any broker, finder, investment banker or any other Person a brokerage, finder's or other fee or commission in connection with this Agreement or the Acquisition.

4.6    <u>No Litigation.</u>  As of the date hereof, there is no claim, action, suit or proceeding pending or, to the knowledge of Purchaser, threatened, before any Governmental Authority that prohibits or restricts, or seeks to prohibit or restrict, the consummation of the Acquisition.

ARTICLE V
ADDITIONAL COVENANTS

5.1    <u>Consents, Filings and Authorizations; Efforts to Consummate</u>.  As promptly as practicable after the Closing Date hereof, Purchaser and Seller shall make all filings and submissions under such laws as are applicable to them or to their respective Affiliates and as may be required for the consummation of the Acquisition in accordance with the terms of this Agreement.  Purchaser and Seller shall consult with each other prior to any such filing, and neither Party shall make any such filing or submission to which the other Party reasonably objects in writing.  All such filings shall comply in form and content in all material respects with applicable laws.  No agreement that could have a negative impact on the Business will be made by Seller or the Company with any third party to obtain any consent or approval to the transactions contemplated hereby, except in accordance with a plan previously agreed to in writing by Purchaser.  Subject to the terms and conditions herein, each Party shall use its commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things necessary, proper or advisable: (a) to cause the conditions to the obligations of each Party to consummate the Acquisition to be satisfied as soon as reasonably practicable and (b) under applicable laws, permits and orders, to consummate and make effective the Acquisition as soon as reasonably practicable, including obtaining all consents required in connection with such Party's consummation of the Acquisition.  In addition to the foregoing, the Company at the sole expense of Seller shall cause to be prepared and filed federal and state tax and other returns and reports for the Company for all periods prior to the Closing Date and the Purchaser shall be responsible for the preparation and filing of all such tax and other returns and other reports from and after the Closing Date.

5.2    <u>Public Announcements</u>.  From and after the date of this Agreement and thereafter, Purchaser and Seller agree not to make (and shall cause their Affiliates not to make) any public announcement or other disclosure concerning this Agreement or the transactions contemplated herein without obtaining the prior written consent of the other Party as to form, content and timing (such consent not to be unreasonably withheld); <u>provided</u>, <u>however</u>, that the foregoing shall not restrict any Party (or any Affiliate of such Party from making any public announcement or disclosure as may be required by applicable law if such Party (or Affiliate thereof) gives the other Party prompt written notice of the proposed disclosure.

5.3    <u>Restrictive Covenants</u>.  In order to induce Purchaser to enter into this Agreement, each of Seller, and Robert  Coleman, Jr. ("Robert") expressly covenants and agrees that at the Closing on the Closing Date, (s)he will execute and deliver to Purchaser and the Company a Restrictive Covenant Agreement in the form of Exhibit 5.3 hereto.

5.4    <u>Expenses.</u>  Except as otherwise specifically provided in this Agreement, each Party shall bear its own expenses incurred in connection with the negotiations, preparation, execution and performance of the Transaction Documents, its due diligence investigation and the consummation of the Acquisition, including all fees and expenses of such Party's Representatives.  None of such expenses shall be charged to or borne by the Company.

5.5    <u>Section 338 Election</u>.  Purchaser and Seller shall jointly make a timely election provided for by Section 338(h)(10) of the Code and Section 1.338(h)(10) of the Treasury

regulations (and any comparable election under state or local laws) (collectively the "Election") with respect to the acquisition of the Shares. The Purchase Price shall be allocated among the assets of the Company for purposes of completing all forms of any nature necessary to effectuate the Election (including, but not limited to, Internal Revenue Service Form 8023, Corporate Qualified Stock Purchase, Internal Revenue service Form 8883, Asset Allocation Statement, and any similar forms under applicable state or local law) (the "Section 338 Forms") in accordance with applicable U.S. Treasury regulations. Such allocation shall be determined by Purchaser and Seller as of the Closing Date and shall be set forth on Exhibit 5.5 attached hereto and made a part hereof on the Closing Date; provided, however, that such allocation shall be modified to the extent necessary to reflect any and all changes to the Purchase Price as set forth in this Agreement.. Based on such allocation as may be modified in accordance herewith, Purchaser and Seller shall jointly prepare the Section 338 Forms and Purchaser and Seller shall execute and deliver the Section 338 Forms to one another for filing. The Company and Purchaser shall duly and timely file the Section 338 Forms in accordance with applicable tax laws and in accordance with this Agreement. The Company and Purchaser shall report the acquisition by Purchaser of the Shares pursuant to this Agreement consistent with the Elections and shall take no position contrary thereto or inconsistent therewith in any Tax Return, any discussion with or proceeding before any taxing authority, or otherwise. Notwithstanding anything to the contrary in this Agreement, Seller shall be solely responsible for the payment of any Tax arising from the Election and shall indemnify Purchaser from and against any claims in respect thereof.

    5.6   Excluded Liabilities. Seller, prior to and after the Closing Date, shall be solely responsible for the payment and performance, when due, of any liability or obligation: (a) for breach of contract claims, violation of law claims, comprehensive and general liability claims, tort claims or other claims or causes of action which relate to, arise from or in connection with the ownership or use of the Company's assets or the operation of the business of the Company on or before the Closing Date, whether any such claim is asserted prior to or after the Closing Date; and (b) for any liability or obligation of the Company, whenever arising, with respect to, arising from or in connection with any claim for additional Taxes of any kind, nature or description, including any claimed penalties or interest, relating to any period prior to the Closing Date.

    5.7   Seller's Post Closing Assistance. During a reasonable post Closing period, Seller shall will use her reasonable efforts to assist with the transition of the Business to Purchaser's ownership including, without limitation, cooperating and assisting with identifying, hiring and training key employees, customer and supplier relationships and imparting his technical knowledge and business judgment and other relevant matters.

    5.8   Prorations, Prepaid Expenses, Refunds and Rebates. The parties acknowledge and agree that certain refunds and rebates are due the Company for periods prior to the Closing Date, but will be paid to the Company following the Closing Date. The sources and amounts of such refunds and rebates are set forth on Schedule 5.8 (collectively "Refunds and Rebates"). In addition, the parties acknowledge and agree that the Company has prepaid certain expenses, portions of which apply to periods following the Closing Date. The recipient and amounts of such prepaid expenses, and the dollar amount applicable to the period following the Closing Date (the "Post-Closing Prepaid Amount"), are set forth on Schedule 5.8. The parties agree that the

646533-4

total amount of Refunds and Rebates, plus the Post Closing Prepaid Amount, shall be referred to herein as "Prorations" and the dollar amount of such Prorations shall be credited to Seller as additional Purchase Price, the total amount of which shall be payable by Purchaser to Seller upon the final determination of the total amount thereof.

5.9    Lease and Option Regarding Lease Real Property.  On the Closing Date, the Company and B & C Real Estate Development, LLC ("Landlord") shall enter into a new lease for the Leased Real Estate (the "Real Estate Lease") substantially in the form attached hereto as Exhibit 5.9. In addition, Purchaser and Landlord shall execute an Option to Purchase Real Estate (the "Option"), whereby Purchaser shall have the option to purchase the Leased Real Estate from Landlord for a period of one (1) year following the Closing Date, for an option payment of $25,000, and on the terms and conditions set forth in the Option.

5.10    Supply Bonds.  The Company, Seller, Robert and Landlord are parties to that certain Agreement of Indemnity dated October 4, 2005 (the "Indemnity Agreement") with International Fidelity Insurance Company ("Surety") in connection with that certain Supply Bond dated October 4, 2005 and that certain Supply Contract Bond dated January 18, 2005 (collectively, the "Supply Bonds"). Purchaser shall indemnify Seller, Robert and Landlord with respect to any claims or liabilities under such Supply Bonds.


# ARTICLE VI
## CONDITIONS TO CLOSING

6.1    Conditions to the Obligations of Seller and Purchaser.  The obligations of Seller and Purchaser to consummate the Acquisition are subject to the satisfaction or, if permitted by applicable law, waiver of the following condition on or prior to the Closing Date:

(a)    No provision of any applicable law shall be in effect that prohibits or restricts the consummation of the Acquisition;

(b)    no order of any court or Governmental Authority shall have been entered that enjoins, restrains or prohibits this Agreement or the Acquisition; and

(c)    no action shall be pending or, to the knowledge of the Parties, threatened that seeks to enjoin, restrain, prohibit or obtain damages with respect to this Agreement or the Acquisition.

6.2    Conditions to Obligation of Seller.  The obligation of Seller to consummate the Acquisition is subject to the fulfillment at or prior to the Closing of the following conditions, any one or more of which may be waived, in writing, in whole or in part by Seller:

(a)    Accuracy of Representations and Warranties.  Each of the representations and warranties of Purchaser contained in this Agreement shall have been true and correct in all material respects when made and on and as of the Closing as if made at and as of the Closing except for those representations and warranties that are qualified by materiality which shall be true and correct in all respects.

646533-4

(b)    <u>Performance</u>.  Purchaser shall have performed and complied with all agreements, obligations and covenants required to be performed or complied with by it on or prior to the Closing Date.

(c)    <u>Purchase Price</u>.  The Purchase Price shall have been paid by Purchaser in accordance with <u>Section 2.2</u>. and the Note shall have been executed and delivered to Seller.

(d)    <u>Deliveries to Seller</u>.  Purchaser shall have delivered to Seller the following:

(i)    A certificate, dated the Closing Date, of the Purchaser confirming the matters set forth in <u>Section 6.2(a)</u> and <u>(b)</u>;

(ii)    A certificate of good standing from the Illinois Secretary of State, dated as of a recent date, certifying that Purchaser is in good standing in the State of Illinois.

(iii)    The Guaranty , duly executed by Guarantor;

(iv)    A duly executed Security Agreement granting the security interest in the Company's assets, as set forth in Section 2.2;

(v)    The Real Estate Lease, duly executed by the Company;

(vi)    The Option, duly executed by Purchaser;

(vii)    A certificate, dated the Closing Date, of the Secretary of the Purchaser certifying, among other things, that attached or appended to such certificate:  (A) is a true copy of all corporate actions taken by it, including resolutions of its board of directors, authorizing the consummation of the Acquisition and the execution, delivery and performance of this Agreement and each of the Transaction Documents to be delivered by it pursuant hereto; and (B) are the names and signatures of its duly elected or appointed officers who are authorized to execute and deliver this Agreement and the other Transaction Documents to which it is a party.

6.3    <u>Conditions to Obligation of Purchaser</u>.  The obligation of Purchaser to consummate the Acquisition is subject to the fulfillment at or prior to the Closing of the following conditions, any one or more of which may be waived, in writing, in whole or in part by Purchaser:

(a)    <u>Accuracy of Representations and Warranties</u>.  Each of the representations and warranties of Seller and the Company contained in this Agreement shall have been true and correct in all material respects when made and on and as of the Closing as if made at and as of the Closing except for those representations and warranties that are qualified by materiality which shall be true and correct in all respects; <u>provided</u>, that representations and warranties which address matters only as of a certain date shall have been true and correct in all material respects as of such certain date except for those representations and warranties that are qualified by materiality which shall be true and correct in all respects.

646533-4                                          27

(b)    Performance.  Seller and the Company shall have performed and complied with all agreements, obligations and covenants required to be performed or complied with by them on or prior to the Closing Date.

(c)    No Material Adverse Effect.  During the period from the date hereof to the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect.

(d)    Real Estate Lease and Option.  The Real Estate Lease and Option shall have been executed and delivered.

(e)    Due Diligence.  Purchaser and its Representatives shall have completed their due diligence review of the Company and the Business and Purchaser, in its sole and absolute discretion, shall be satisfied with the results of such due diligence.

(f)    Deliveries by Seller and the Company.  Seller or the Company shall have delivered to Purchaser the following:

(i)    All original certificates evidencing the Shares which have been issued to Seller, accompanied by stock powers duly executed in blank;

(ii)    A certificate, dated the Closing Date, of each of Seller and the Secretary of the Company confirming the matters set forth in Section 6.3(a) and (b);

(iii)    A certificate, dated the Closing Date, of the Secretary of the Company certifying, among other things, that attached or appended to such certificate: (A) is a true and correct copy of its by-laws, and all amendments thereto; (B) is a true copy of all corporate actions taken by it, including resolutions of its board of directors, authorizing the consummation of the Acquisition and the execution, delivery and performance of this Agreement and each of the Transaction Documents to be delivered by it pursuant hereto; and (C) are the names and signatures of its duly elected or appointed officers who are authorized to execute and deliver this Agreement and the other Transaction Documents to which it is a party;

(iv)    The articles of incorporation of the Company and all amendments thereto, certified by the Illinois Secretary of State;

(v)    The minute book and stock transfer ledger of the Company;

(vi)    The resignations of each member of the board of directors and each officer of the Company whose resignation has been requested in writing by Purchaser prior to the Closing Date.

(vii)    A certificate of good standing from the Illinois Secretary of State, dated as of a recent date, certifying that the Company is in good standing in the State of Illinois; and

(viii)    Uniform Commercial Code, judgment and tax lien searches of Seller and the Company, dated within thirty (30) days prior to the Closing Date, confirming that

Seller is the owner of the Shares free and clear of any Liens, and that the Company owns its assets free and clear of any Liens.

6.4     Non-Competitive Agreements.     Purchaser shall have received Restrictive Covenant Agreements duly executed by each of Seller and Robert.

6.5     Financing.  The lender(s) providing financing to Purchaser in connection with the transaction contemplated by this Agreement shall be prepared to disburse to Purchaser the loan proceeds required to consummate the Closing on the Closing Date on terms which are acceptable to Purchaser.

6.6     Key Employees.  The employees of the Company listed on the Key Employee List shall be employed by the Company immediately prior to the Closing, and neither Seller nor the Company shall have received any notice of, or otherwise be aware of, any such employee's intent to terminate employment with the Company as a result of the consummation of the transactions contemplated hereby.

6.7     Termination of Tax Year.  At the Closing on the Closing Date the parties shall execute such documents and consents as may be necessary to terminate the tax year of the Company for tax purposes and such other documents as may be required in connection therewith and make such filings with the Internal Revenue Service and the Illinois Department of Revenue as shall be required.

## ARTICLE VII
## POST-CLOSING COVENANTS

7.1     Tax Covenants.

(a)     From and after the Closing, each of Seller and Purchaser shall cooperate with the other in connection with Tax matters relating to the Company and the Business, including: (i) the preparation and filing of Tax Returns; (ii) the determination of a Party's liability for Taxes and the amounts of any Taxes due or of a Party's right to a refund of Taxes and the amount of any such refund; (iii) the examination of Tax Returns; and (iv) the conduct of any administrative or judicial proceedings in respect of Taxes assessed or proposed to be assessed.  Such cooperation shall include each Party making all information and documents in its possession relating to the Company and the Business available to the other Party.

(b)     The Parties shall retain all Tax Returns, schedules and work papers, and all material records and other documents relating thereto, until the expiration of the applicable statute of limitations (including, to the extent notified by any Party, any extension thereof) of the Tax period to which such Tax Returns and other documents and information relate. Each Party shall also make available to the other Party, as reasonably requested and available, personnel (including officers, directors, employees and agents) responsible for preparing, maintaining and interpreting information and documents relevant to Taxes, and personnel reasonably required as witnesses or for purposes of providing information or documents in connection with any administrative or judicial proceedings relating to Taxes.  Any information or documents provided under this Section 7.1(b) shall be kept confidential by the party receiving such

646533-4

29

information or documents, except as may otherwise be necessary in connection with the filing of Tax Returns or in connection with administrative or judicial proceedings relating to Taxes.

(c)    In the event any Governmental Authority with responsibility for Taxes informs Seller or Purchaser of any notice of proposed audit, claim, assessment or other dispute concerning an amount of Taxes with respect to which the other Party may incur liability hereunder, the Party so informed shall promptly notify the other Party of such matter. Such notice shall contain factual information (to the extent known) describing any asserted Tax liability in reasonable detail and shall be accompanied by copies of any notice or other documents received from such Governmental Authority with respect to such matter. If an Indemnified Party has knowledge of an asserted Tax liability with respect to a matter for which it is to be indemnified hereunder and such Party fails to provide the Indemnifying Party prompt notice of such asserted Tax liability, then (i) if the Indemnifying Party is precluded from contesting the asserted Tax liability in any forum as a result of the failure to give prompt notice, the Indemnifying Party shall have no obligation to indemnify the Indemnified Party for Taxes arising out of such asserted Tax liability, and (ii) if the Indemnifying Party is not precluded from contesting the asserted Tax liability in any forum, but such failure to provide prompt notice results in a monetary detriment to the Indemnifying Party, then any amount which the Indemnifying Party is otherwise required to pay the Indemnified Party pursuant to this Agreement shall be reduced by the amount of such detriment.

(d)    In the case of any taxable period that includes (but does not end on) the Closing Date (a "Straddle Period"), (i) real, personal and intangible property Taxes ("Property Taxes") allocated to the Pre-Closing Tax Period shall be equal to the amount of such Property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that are in the Pre-Closing Tax Period and the denominator of which is the number of days in the Straddle Period; and (ii) Taxes (other than Property Taxes) allocable to the Pre-Closing Tax Period shall be computed as if such taxable period ended as of the close of business on the Closing Date, provided that exemptions, allowances or deductions that are calculated on an annual basis (including, but not limited to, depreciation and amortization deductions) shall be allocated between the period ending on the Closing Date and the period after the Closing Date in proportion to the number of days in each period.

7.2    Records; Retention.  Following the Closing, the Company shall, and Purchaser shall cause the Company to, afford Seller and its Representatives access to, and the right to make copies and extracts from, the books, records, personnel files, benefit files, litigation and charge files and other data in the Company's possession relating to the Company and the Business with respect to periods prior to the Closing Date to the extent that such access may be requested by Seller during normal business hours for any reasonable business purpose, including to facilitate the investigation, litigation and final disposition of any claims which may have been or may be made against Seller or its Affiliates.  Purchaser agrees that for a period of five (5) years following the Closing Date, or such longer period as is required by Section 7.1(b), the Company shall not, and Purchaser shall cause the Company not to, destroy or otherwise dispose of any such books, records or data in its possession without (a) giving Seller at least ten (10) days' prior written notice of such intended disposition and (b) offering to deliver to Seller, at Seller's

646533-4                                      30

expense, custody of any or all of the books, records and data that the Company intends to destroy.

ARTICLE VIII
SURVIVAL; INDEMNIFICATION

8.1    <u>Expiration of Representations and Warranties.</u> Except as expressly provided in this <u>Section 8.1</u>, the representations and warranties of the parties in this Agreement or in any other Transaction Document hereto shall survive the Closing for a period of eighteen (18) months.. All representations and warranties of Seller or the Company contained in <u>Section 3.1</u> (Title to Shares), <u>Section 3.4</u> (Authority), and <u>Section 3.23</u> (Title to and Sufficiency of Assets) and any representation and warranty which was known by Seller or the Company to be untrue when made, shall survive the Closing without limitation. All representations and warranties of Seller and the Company contained in <u>Section 3.19</u> (Taxes) and in <u>Section 3.30</u> (Environmental) shall survive the Closing until the expiration of the applicable statute of limitations.

8.2    <u>Indemnification by Seller.</u> Subject to the limitations set forth in this <u>Article VIII</u>, Seller shall indemnify, defend, save and hold Purchaser, Purchaser's Affiliates (including, after the Closing, the Company) and the Representatives of any of them (collectively, "<u>Purchaser Indemnitees</u>") harmless from and against any and all Losses incurred by any Purchaser Indemnitee arising out of:

(a)    any breach of any representation or warranty made by Seller in this Agreement or any Transaction Document; and

(b)    any breach of any covenant or agreement made by Seller or the Company in or pursuant to this Agreement or any Transaction Document.

8.3    <u>Indemnification by Purchaser.</u> Subject to the limitations set forth in this <u>Article IX</u>, Purchaser shall indemnify, defend, save and hold Seller, Seller's Affiliates and the Representatives of any of them (collectively, "<u>Seller Indemnitees</u>") harmless from and against any and all Losses incurred by any Seller Indemnitee arising out of:

(c)    any breach of any representation or warranty made by Purchaser in this Agreement; and

(d)    Purchaser's breach of any covenant or agreement made by Purchaser in or pursuant to this Agreement.

8.4    <u>Notice of Claims.</u> If any Purchaser Indemnitee or Seller Indemnitee (an "<u>Indemnified Party</u>") believes that it has suffered or incurred any Losses for which it is entitled to indemnification under this <u>Article VIII</u>, such Indemnified Party shall so notify the Party from whom indemnification is being claimed (the "<u>Indemnifying Party</u>") as promptly as practicable, with reasonable particularity in light of the circumstances then existing, but in any event within thirty (30) days of the date the Indemnified Party obtained actual knowledge. If any claim is instituted by or against a third party with respect to which any Indemnified Party intends to claim indemnification under this <u>Article VIII</u>, such Indemnified Party shall as promptly as practicable, but in any event within twenty (20) days following the date the Indemnified Party

obtained actual knowledge, notify the Indemnifying Party of such claim. The notice provided by the Indemnified Party to the Indemnifying Party shall describe the claim (the "Asserted Liability") in reasonable detail and shall indicate the amount (or an estimate) of the Losses that have been or may be suffered by the Indemnified Party. The failure of an Indemnified Party to give any notice required by this Section 8.4 shall not affect any of the Indemnified Party's rights under this Article VIII or otherwise except and to the extent that such failure is prejudicial to the rights or obligations of the Indemnifying Party.

    8.5    Opportunity to Defend Third Party Claims. If any action is brought by a third party against any Indemnified Party, the Indemnifying Party shall be entitled, at its own expense: (a) to participate in such action and (b) upon notice to the Indemnified Party made at any time during the course of any such claim, suit, action or proceeding, to assume the defense thereof; provided, that (i) the Indemnifying Party's counsel is reasonably satisfactory to the Indemnified Party, (ii) the Indemnifying Party shall keep the Indemnified Party informed, on a regular basis, of the status of such claim, suit, action or proceeding and (iii) the Indemnifying Party shall consult with the Indemnified Party upon the Indemnified Party's reasonable request for such consultation from time to time with respect to such claim, suit, action or proceeding. The Indemnified Party shall cooperate with respect to any such participation, defense, settlement or compromise. The Indemnified Party shall have the right to employ its own counsel in any such case, but the fees and expenses of the Indemnified Party's counsel shall be at the sole expense of the Indemnified Party unless: (i) the Indemnifying Party shall have authorized in writing employment of such counsel at the expense of the Indemnifying Party; (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to the Indemnified Party to defend such action within thirty (30) days after the Indemnifying Party received notice of the Asserted Liability; (iii) the Indemnified Party shall have reasonably determined that the Indemnifying Party is not diligently pursuing such action or is not keeping the Indemnified Party reasonably informed of the status of such action; or (iv) the Indemnified Party shall have reasonably concluded that a conflict of interest exists between the Indemnified Party and the Indemnifying Party, in any of which events the fees and expenses of one additional counsel shall be borne by the Indemnifying Party. The Indemnifying Party shall not settle or compromise any action or consent to the entry of a judgment without the written consent of the Indemnified Party (which shall not be unreasonably withheld) that: (a) does not provide for the claimant to give an unconditional release to the Indemnified Party in respect of the Asserted Liability; (b) involves relief other than monetary damages; or (c) places restrictions or conditions on the operation of the business of the Indemnified Party or any of its Affiliates. The Indemnifying Party shall not be liable for any settlement of any claim or action effected without its written consent. After payment of any Asserted Liability by the Indemnifying Party, the Indemnified Party, if requested by the Indemnifying Party, shall assign to the Indemnifying Party all rights the Indemnified Party may have against any applicable account debtor or other responsible Person in respect of the Asserted Liability. If the Indemnifying Party chooses to defend any Asserted Liability, the Indemnified Party shall make available to the Indemnifying Party any books, records or other documents within its control that are necessary or appropriate for such defense.

    8.6    Effect of Insurance and Other Sources of Reimbursement. The amount of any Losses for which indemnification is provided under this Article VIII shall be reduced by (i) the insurance proceeds received with respect to any such Loss and (ii) any other amount, if any,

recovered from third parties (as a result of indemnification, contribution, guarantee or otherwise) by the Indemnified Party (or its Affiliates) with respect to any Losses; provided however, that nothing herein shall be deemed to obligate an Indemnified Party to have collected such amounts as a condition precedent to obtaining payment from the Indemnifying Party hereunder, it being understood and agreed that any subsequent collection of Losses paid by the Indemnifying Party shall be reimbursed to the Indemnifying Party within fifteen (15) days after receipt thereof by the Indemnified Party.  Payments received by any Party pursuant to this Article VIII shall be treated by the parties as an adjustment to the Purchase Price.

8.7    Payment of Losses; Basket; Cap.  Neither a Purchaser Indemnitee nor a Seller Indemnitee shall be entitled to indemnification for any Losses pursuant to Section 8.2(a) or Section 8.3(a), as applicable, unless the aggregate amount of such party's Losses exceeds thirty seven thousand five hundred dollars ($37,500.00) (the "Basket").  Any materiality qualification contained in Article III or Article IV shall not be taken into account in determining the aggregate amount of the Indemnified Party's Losses.  In the event the aggregate amount of such Losses exceeds the Basket, then the Indemnifying Party shall indemnify the Indemnified Party with respect all losses without regard to the Basket.  In no event shall the amount of such Party's Losses exceed the amount of one million five hundred thousand dollars ($1,500,000) (the "Cap"); provided, however, that the Cap shall not apply in the event of proven fraud..

8.8    Offset.  Without precluding Purchaser from exercising any other right, power or remedy pursuant to this Agreement or at law or in equity, Purchaser shall be entitled to offset against amounts due Seller hereunder or under any agreement delivered in connection with the Transaction including but not limited to the Note, any Losses (an "Offset Amount").  In addition, Purchaser may suspend payment of any amount otherwise payable under the Note upon and after the date of any Notice of Claim under Section 8.4 hereof and thereafter until final resolution of such claim under Section 8.5; provided, that any such suspended payments shall be paid into a third party escrow account until the final resolution of such claim under Section 8.5.  Purchaser shall notify Seller of any Offset Amount to which the Purchaser asserts the right of offset or payment suspension under this Section 9.8 (an "Offset Notice").  If Seller has not objected to such offset or payment suspension in writing within thirty (30) days following receipt of the Offset Notice, Purchaser may make such offset or payment suspension as provided in this Section 9.8.  If Seller provides written notice of objection during said thirty (30) day period, Purchaser may not offset such amount, but may make a payment suspension subject to the requirement to escrow such funds.  If, at any time, a final non-appealable award is entered by arbitrator(s) or a final judgment of a court of competent jurisdiction which is not subject to appeal is entered, in either case with respect to an Offset Amount, Purchaser may offset such Offset Amount.  A dispute shall be deemed to have been resolved to the extent provided in the joint written agreement of Purchaser and Seller.

ARTICLE IX
GENERAL

9.1    Notices.  All notices, requests, claims, demands or other communications that are required or may be given pursuant to the terms of this Agreement or the other Transaction

Documents shall be in writing and shall be deemed to have been duly given: (a) when delivered, if delivered by hand; (b) one (1) Business Day after transmitted, if transmitted by a nationally-recognized overnight courier service; (c) when sent by facsimile transmission, if sent by facsimile transmission which is confirmed; or (d) three (3) Business Days after mailing, if mailed by registered or certified mail (return receipt requested), in each case to the Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 10.1):

<div style="margin-left:2em;">

If Seller or Company:  Coleman Fire Proof Door Co.
N9110 11th Drive
Westfield, WI 53964
Attention: Chicuzo Coleman
Facsimile:

With a copy to:  Donald J. Russ, Jr., Esq.
Chuhak & Tecson, P.C.
30 S. Wacker Drive, Suite 2600
Chicago, IL 60606
Facsimile:312.444.9027

If to Purchaser:  Spenta Enterprises Ltd.
761 Buena Road
Lake Forest, IL 60045
Attention: Hoshang R. Karani
Facsimile: 847.615.7061

With a copy to:  Gary L. Auerbach, Esq.
Much Shelist
191 N. Wacker Drive, Suite 1800
Chicago, IL 60606
Facsimile: 312.521.2588

</div>

9.2 Severability.  If any provision of this Agreement for any reason shall be held to be illegal, invalid or unenforceable, such illegality shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such illegal, invalid or unenforceable provision had never been included herein.

9.3 Assignment; Binding Effect.  No assignment by any Party of its rights nor delegation by any Party of its obligations under this Agreement or any Transaction Document shall be permitted unless the other Parties consent in writing thereto.  This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

9.4 Exhibits and Schedules.  All Exhibits and Schedules attached hereto and referred to herein are hereby incorporated herein and made a part of this Agreement for all purposes as if

646533-4

34

fully set forth herein. Except as expressly set forth on the attached Schedules, the definitions contained in the Agreement are incorporated therein by reference.

9.5    Governing Law; Submission to Jurisdiction. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ILLINOIS. COURTS WITHIN THE STATE OF ILLINOIS (LOCATED WITHIN LAKE COUNTY) WILL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS. THE PARTIES HEREBY CONSENT TO AND AGREE TO SUBMIT TO THE JURISDICTION OF SUCH COURTS. EACH OF THE PARTIES WAIVES, AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (A) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF SUCH COURTS; (B) SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY SUCH COURTS; OR (C) ANY LITIGATION COMMENCED IN SUCH COURTS IS BROUGHT IN AN INCONVENIENT FORUM.

9.6    Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION OR AGREEMENT CONTEMPLATED HEREBY OR THE ACTIONS OF ANY PARTY HERETO IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

9.7    Interpretation. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions of this Agreement.

9.8    Counterparts. This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different Parties in separate counterparts, each of which when executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

9.9    Entire Agreement. This Agreement (including the Schedules and Exhibits attached hereto) and the other Transaction Documents executed in connection with the consummation of the Acquisition contain the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, written or oral, with respect thereto, other than the Confidentiality Agreement.

9.10    Waivers and Amendments. This Agreement may be amended, superseded, canceled, renewed or extended only by a written instrument signed by the Parties hereto. The provisions hereof may be waived only in writing signed by the Party waiving compliance. No delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any Party of any such right, power or

privilege, nor any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege.

9.11  <u>No Third Party Beneficiaries</u>.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person other than the Parties hereto and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement, such third parties specifically including employees and creditors of the Company.

9.12  <u>Further Assurances</u>.  Upon the request of any Party, each other Party shall, on and after the Closing Date, execute and deliver to the requesting Party such other documents, further releases, assignments and other instruments as may be required or deemed reasonably necessary to effect or evidence the transfer and assignment to Purchaser of all or any of the Shares and to otherwise carry out the purposes of this Agreement.

*[Signatures appear on the next page]*

**IN WITNESS WHEREOF**, the Parties have caused this Purchase Agreement to be signed in their respective names by their duly authorized representatives as of the date first above written.

Purchaser:                    SPENTA ENTERPRISES LTD.

By: _____
Its: _____CEO_____

Seller:

_____
CHIZUCO COLEMAN

Company:                    COLEMAN FIRE PROOF DOOR CO.

By: _____
Its: _____

646533-4

37

## JOINDER

Solely for purposes of Section 5.3 of the foregoing Stock Purchase Agreement, the undersigned hereby joins and agrees to be bound by the obligations to execute and deliver to Purchaser the Agreement referred to therein.

Dated: _September 27_ 2006

Robert Coleman, Jr.